## PRIZER'S APPEAL.

Where services are rendered between parent and child, or those standing in *loco parentis*, there can be no recovery unless there is an express promise to pay for the services.

A family relation subsisting between those of kindred blood does not constitute an absolute bar to a recovery for services rendered.

Where a family relation between those of kindred blood exists and services are rendered with the expectation that they will be rewarded by testamentary benefits *alone* ; a recovery cannot be had if no devise or bequest is made ; but if the one receiving them promises to pay for them, without specifying how, when or where, a recovery may be had on a *quantum meruit.*

Appeals from the Orphans' Court of Montgomery County. Nos. 387 and 386 January Term, 1882.

The opinion of the Court below was delivered by

Ross, P. J.:

The question or questions that are presented by this record require at the hands of the Court a brief statement of the facts involved. The decedent, an old man, worn out and diseased, died upon the 27th day of August, 1879. At the time

of his death he was unmarried and left no children or other descendants. His collateral relatives were numerous, and, as is usual in such cases, a contest was at once begun among them. A man who dies leaving children, and has therefore been husband and father, while he has had to bear much of anxiety and sorrow, has at least the comfort of knowing that those of his blood in the ancestral line will not have an opportunity of contesting over his grave for the fragments of the personal property which his industry and labor collected together and which constitute his estate. The man in question seems to have almost been accursed of the Almighty; save in the spoilation of property, his case was like that of Job. Bowed in frame, gangrened in body, weak in bowels, with a worn out stomach, suffering from hernia and hemorrhoids, and finally imbecile in mind as well as helpless in body, he became in his later years a spectacle of disgusting misery, such as the Court before has never heard detailed. It is creditable to humanity, as well as to the ties of blood, that these influences were strong enough to induce those, or at least one of those, who knew him in earlier and better days, and her niece, quite a young girl, to faithfully and carefully tend him down to the hour of his death.

The Court has thus generally described his situation, for to do more than describe it by general terms inspires a feeling of unutterable and fearful disgust.

The testimony of Mr. Peixoto and others has been read by the Court from a sense of duty, but with a loathing that rendered the performance of that duty almost impossible. It was under these circumstances that he was nursed and attended by his niece, Margaret Prizer, and Bertha Kooken, who, as the Court understands the relationship, was his great niece. These two ladies are the claimants here, for the care and attention thus graciously bestowed upon this wretched intestate. It seems that he owned a house and ground and possessed personal property to the amount of $5,572.38, as per balance sent to the auditor for distribution. He lived for many years prior to April 5, 1870, with his sister, his niece, Margaret Prizer, with Mrs. Kooken and her children, who all occupied

a house owned by him. Their relations before that date are not so material, for at that time his sister died and the auditor finds that Margaret Prizer became the head of the family. She and the Kookens lived in one part of the house, the old man occupied, as the Court believes, a separate portion of the house, and these constituted, at least for social purposes, one family. They got the milk from two of his cows, and vegetables from a poorly cultivated garden, and from three rows of badly cultured potatoes each and every year that were his property. There is no evidence that he ever contributed to their maintenance and support to the extent of a dollar. Their means were limited ; and at a later period Miss Bertha became a school teacher, thus relieving the family during the time she continued teaching, until the sickness of the intestate compelled her to return home, or rather to give up her school to assist Margaret Prizer in the performance of her duties towards the decedent, as his infirmities grew more and more pronounced. Such was the situation. A common table and apparently a common household, and all these existing in connection with a kinship by consanguinity. It is said (these being the facts) that however meritorious the claims of these two ladies may be, the law arising upon the facts forbids their recovery of remuneration for their services, because of the family relationship thus described, and the law regulating compensation under such circumstances. It is said that their relations are an absolute bar against any claim which could be preferred by these ladies, unless there be direct and positive proof of an express contract between them, or either of them, and Frederick Prizer.

The Court has examined with earnest and anxious care every case cited by the learned counsel either on the one side or the other. The facts, as presented in the testimony have been painfully and thoroughly read, and it is believed that no care has been spared in the endeavor to master the facts and comprehend the law as demonstrated by the cases. That there is confusion, and, to some extent, contradiction in the reported cases, grows out not so much from the law upon the subject, as it does from the findings of fact in the various cases where that law was expounded by the Court of last

resort. To review the cases critically in a judicial opinion, would require time and labor which could not well be bestowed upon a single record in a district crowded with business, such as this. The parties, therefore, must be satisfied with the assurance that the cases have been carefully examined and critically analyzed, and that it is believed by the Court that the deductions about to be drawn from them are fairly deducible from their entire current, modified as th t current is by an occasional ripple, caused by a departure from the true course, by a case of great hardship, where either the minds of the jury, or the judgment of the Court, have been drawn away from that course by the magnetic instinct of sympathetic feeling. Care has also been taken by this Court to avoid such influence being exerted over its own process in reaching conclusions.

This case has features which draw one strongly toward the claimants because of the righteousness of their individual claims; but the Court feels the wisdom and the expediency of the law, which declares that services rendered with no thought of compensation, but purely from love and affection cannot, when death has closed over the recipient of their kindness, claim to charge a monied value for that which was freely given without expectation of payment; and received in the same spirit with no other sense of obligation than that of deep and abiding thankfulness. Now the conclusions reached by the Court, and which it reduces to the form of propositions are those by which it means to be guided in reaching the conclusions about to be expressed upon the facts here.

*First.* That in general, if one performs services for another at his request, no designated compensation being named, the person performing the services may recover their value upon the implied promise to pay, unless there be any fact or rules of law existing which repel the presumption that the services were rendered in expectation of compensation.

*Second.* That among those circumstances of fact and rules of law, which operate to repel the presumption thus stated, are the want, as a matter of fact, of a contract, either express or implied, and the relationship of the parties in a degree

which either bars or tends to repel such presumption, under the law as declared in Pennsylvania.

*Third.* That where services are rendered between parent and child, or those standing *in loco parentis,* there can be no recovery had for services rendered by either to the other, unless there be proof, direct and positive, of a contract to pay for such services, or direct and positive proof of promise to pay. All other degrees of consanguinity or affinity are circumstances which tend to rebut the presumption, but such relationship does, not, of itself in the absence of direct and positive evidence to the contrary, constitute an absolute bar.

*Fourth.* A family relation subsisting between those of kindred blood, with services rendered by those occupying that relation to each other, does not constitute, in itself, an absolute bar to the recovery of compensation for those services, if there **be anything** in the attitude or relationship of the parties, or **in the declaration of the party** receiving the benefits, which **rebuts** the idea that the family relationship was the consideration for the services solely, with no expectation of other remuneration.

*Fifth.* Where, under such circumstances as those last mentioned, services are rendered under the expectation and belief that they will be rewarded by testamentary benefits *alone,* there can be no recovery where the decedent fails to meet such expectation, either by devise or bequest. But if services are accepted by one holding a family relationship, who, while receiving promises to pay for them without specifying how, when or where, even although one performing the service expected to be thus rewarded, no matter what the relationship may have been (less than parent and child, and possibly even them), a recovery may be had upon such promise or promises as upon a *quantum meruit.*

It is not pretended, that an isolated case may not be found here and there, which would not, at first blush, seem to impinge upon each and all of these propositions. But the current of the vast stream of authorities, it is thought, fully establishes, at least by the weight of authority, their general accuracy. To sustain this conclusion I might cite every case

upon the exhaustive briefs presented by the learned counsel who so very ably on both sides argued this cause; and beyond the ripples of which I have spoken and an occasional damning back of the force of the stream occasioned by juries running riot in damages, it is thought that there is but one direction in them all; and that is stated in the proposition just enunciated. The Court, therefore, will not burden this opinion by citations of cases. Counsel have all, with the exception possibly of Culp's Appeal, 28th Legal Intelligencer, page 60 ; Ruckman's Appeal in re Armstrong Estate, 11 P. F. S. 257.

It now remains to apply the principles thus deduced, to the case at bar. It is clear that a family relation, modified in some respects, existed between Frederick Prizer, Margaret and her female surroundings. Does this bar a recovery on the part of the claimants. It surely does not, under the propositions declared in this opinion as the law, resulting upon the general tenor of the cases. Two of these propositions, viz: 4th and 5th are (and for the purposes of distinctness I now recapitulate them) as follows:

4th. A family relation subsisting between those of kindred blood, with services rendered by those, occupying that relation to each other, does not constitute, in itself, an absolute bar to the recovery of compensation for those services, if there be anything in the attitude or relationship of the parties, *or in declaration of the parties securing the benefits,* which rebuts the idea that the family relationship was the consideration for the services solely—with no expectation of other remuneration.

5th. When, under such circumstances, as those last mentioned, services are rendered under the expectation and belief that they will be rewarded by testamentary benefits *alone,* there can be no recovery when the decedent fails to meet such expectations, either by devise or bequest. But if services are accepted by one holding a family relationship, who, while receiving promises to pay for them—without specifying how, when or where—even although the one performing services expected to be thus rewarded—no matter what the relationship may have been (less than parent and child, and possibly

even these)·a recovery may be had on such a promise or prom-
ises, as upon a *quantum meruit.* In ruling this case, therefore,
the Court is governed by the declarations made to Mrs. Wil-
liard, to Mr. Peixoto, and to the claimants in the presence of
Mrs. Williard, it would seem that he clearly recognized his
position with reference to them and their relations to him.
Mrs. Williard, on page      of the testimony reported by the
auditor, says:

"At one time they were working with him, he says, 'Bird'
"(he always called Bertha "Bird") 'you and Aunt Maggie
"shall be well paid. Aunt Maggie was in the room at the
"same time and she could hear what he said. This must have
"been some three years before his death. At any rate it was
"whilst he was still able to come down stairs." To Margaret
Prizer, he said that "Bertha was a good girl and she would be
"well paid for it," and in the re-examination he said, "Bertha
"should be well paid." Bertha Kooken swears that he would
say, "when we wanted to do these services," that he would
say, "You shall be well paid some day, Bertha Kooken."
"About six years before his death I heard my uncle, Frederick
"Prizer, say that she (Margaret) should be well paid, and that
"she would never need work after he was no more." "Peix-
"oto," I said to Frederick, 'You are making the women dirty
work.' He said, 'I know it, and I am going to pay them well
for it sometime.'" On Mrs. Williard's first examination she
testifies that he said that Bertha was a fine girl and she should
be well paid for it some day. At one time he said "she." At
different times he said both Margaret and Bertha should be
well paid for waiting upon him. The pathetic letter of Dec.
14th, 1878, written by Margaret Prizer to Benjamin Prizer,
one of the trustees of Frederick, which I will not quote at
large, and written before this controversy actually arose, and
while the decedent was still living, shows clearly what these
women expected, and that these services were not rendered
purely on account of their family relationship, or that by con-
sanguinity or affinity. There is yet another circumstance.
Bertha had a situation as school teacher, and two years before
the death of the decedent, if the Court be correct in its recol-
lection as to time (for records here are so voluminous and so

unwieldly, and by their mode of being tied up become so unmanageable that labor is greatly increased, and I will not pause to be more accurate) abandoned her position, returned to the house and devoted herself entirely to aiding Mrs Prizer in attending upon the old man, and in performing one of the disgusting duties which the gangrene in his feet and toes required. Thus, then, we have a family occupying the family relation towards each other. First. We have extraordinary and abhorrent services performed. Secondly. We have declarations repeatedly made from time to time, that their recipient intended to pay for them, and though the measure of that payment, or its time, was not fixed by any special contract, this Court cannot resist the conclusion that under the law as stated, and under the facts as they exist, these claimants are not barred from recovering upon a *quantum meruit*. These are the conclusions of the Court upon the facts and law: It must be remembered that they are also the conclusion upon the facts made by a most intelligent auditor, whose learning, experience and practice in this direction have well fitted him to discharge the labors of his appointment. It needs no authority to show that the finding of the auditor upon the facts is like that of a jury, not to be lightly disturbed; but to be accepted, unless positive error is shown by the testimony itself. This Court was not bound to go beyond his finding of fact; but, inasmuch as the contending parties seemed to feel that these findings were error, the Court has given the time and gone to the labor of reviewing the entire testimony.

This disposes of the first question. The claimants may recover upon a *quantum meruit;* and the next inquiry is whether the amount found in their favor by the auditor is greater than it should be or insufficient in amount. Both parties earnestly contend that the auditor is wrong in this regard; and the experience of the Court has long since taught them that when both parties are dissatisfied with the amount of the verdict it is very apt to illustrate the truth of the Latin proverb, "*In medio tutissima ibis.*" At all events, this Court can see no such great discrepancy in the amount as shown by the evidence in the character of the services performed, as

would induce it to disturb the verdict of a jury upon this ground. Surely, a shrewd, intelligent lawyer, who for nearly a quarter of a century has been in active practice at the bar, thoroughly acquainted with the community, the cost and value of labor within its borders, who came face to face with the witnesses, heard described in detail everything that was done (whose notions are not extravagant) ought to be be, and is, a fair judge of what is fair pay in such a case. The Court would hesitate long to disturb the finding of such an auditor, sustained even by less weight of testimony; and can see no error in this regard.

One error of a clerical character, however, does exist in the report. The auditor has allowed for three months more than the claimant had any right to receive. His calculation should have ended January 1, 1879, whereas he carries it down to April 1st of that year. This must be corrected, and the report will be recommitted to him for that purpose.

His conclusion as to the operation of the statute of limita-tions, it is believed, is correct, but the Court has some doubt as to the propriety of his conclusion in relation to the period to which interest should be calculated. This is a solvent estate, and the auditor stops the calculation of interest at the date of filing the account; and in that we think he is wrong. It certainly should run up to the date of the appointment of the auditor, and to December 7, 1881, the time at which he made up his report. It is not deemed necessary to do more than state this law. The addition of the legal demonstration of this legal truth would increase the length of an opinion, which, though abridged to the shortest possible limit, is already too long.

One point, however, has not been noticed in its order, which is deemed worthy of consideration. It was claimed in the argument that Bertha, who was a minor at the time the ser-vices were rendered, or for at least the greater period of that time being a minor, could make no contract, and cannot, therefore, recover, as she could not be bound. The answer to this proposition is at once brief and conclusive, that a minor has a right to insist upon the performance of even an implied

contract, where such contract is for his or her benefit, and the party making it, either with her or for her has received a consideration.

One other remark is due to the case, in regard to the competency of the witnesses. All the enabling statutes removing disqualifications imposed upon witnesses by reason of interest are inapplicable to the case at bar; for they leave the law precisely where it stood under the rules of evidence, as they stood before the Act of 1869, its predecessors and successors in that direction, were enacted. Under these old rules of evidence, the brothers and sisters, and other parties in interest as distributees in Frederick Prizer's estate, would have been incompetent, and are incompetent, to testify to facts in dispute of the claim against the estate of their decedent. Upon the same principle Margaret Prizer and Bertha Kooken would be incompetent, and are incompetent, as witnesses, each for herself; but are entirely competent as witnesses for each other. It is now believed that every point raised has been considered and ruled; and the Court feels that this has been done with all care and patient industry, which the thoroughness and intelligence of the argument deserves to receive.

And now, February 23rd, 1882, all the exceptions, on either side are dismissed; and the report is recommitted to the auditor to make the two corrections indicated by this opinion, and to refile his report.

----

Josiah Prizer and other heirs then appealed.

*Messrs. G. R. Fox, Franklin March, H. R. Brown and L. M. Childs,* for appellants, cited: Neel vs. Neel, 59 Pa., 347; Lantz vs. Frey, 19 Pa., 366; Hartman's Appeal, 3 Grant, 271; Swires vs. Parsons, 5 W. & S., 357; DeFrance vs. Austin, 9 Pa., 309; Amey's Appeal, 49 Pa., 126; Butler vs. Slam, 50 Pa., 457; Urie vs. Johnson, 3 P. & W., 212; Overseers vs. Kline, 9 Pa., 217; O'Kane's Estate, 2 W. N. C., 115; Bishop's Estate, 2 W. N. C., 447; Porter vs. Trust Co., 3 W. N. C., 260; Graham vs. Graham, 34 Pa., 478; Neal vs. Gilmore, 79 Pa., 427; Watkins' Estate, 3 R., 249; Candor's Appeal, 5 W. & S., 513; Gordner vs. Heffley, 49 Pa., 163; Houck vs. Houck,

11 W. N. C., 262; Pollock vs. Ray, 85 Pa., 430; Bash vs. Bash, 9 Pa., 260; McConnell's Appeal, 10 W. N. C., 1; Little vs. Dawson, 4 Dall., 111; Wallace vs. Floyd, 29 Pa.; 184; Thompson vs. Stevens, 71 Pa., 161; Leidig vs. Coover, 47 Pa., 534.

B. M. Boyer, Esq., contra, cited the following additional cases: Roberts vs. Swift, 1 Yeates, 209; Snyder vs. Castor, 4 Yeates, 353; Jack vs. M'Kee, 9 Pa., 235; Malaun vs. Ammon, 1 Gr., 123; Smith vs. Milligan, 43 Pa., 107; Shoch vs. Garrett, 69 Pa., 144; Cottrel's Estate, 2 W. N. C., 83.

The Supreme Court affirmed the decree of the Orphans' Court on May 1st, 1882, in the following opinion,

PER CURIAM:

We affirm the decree in these cases upon the opinion of the learned judge in the Court below.

> Decree affirmed and appeals dismissed at the costs of the appellants.